**BOARD OF SUPERVISORS OF CERRO GORDO COUNTY, Iowa, Appellee,**

v.

**Robert J. MILLER and Harm Vierkant, d/b/a Chazen's Auto Parts, Appellants.**

**No. 53661.**

Supreme Court of Iowa.

Sept. 5, 1969.

Mark D. Buchheit, West Union, for appellants.

William Pappas and Vern Robinson, Mason City, for appellee.

RAWLINGS, Justice.

This appeal involves the constitutionality of certain provisions of a county zoning ordinance requiring discontinued nonconforming use of property within five years after its enactment.

By action in equity plaintiff board of supervisors sought to enjoin defendants' continued use of their land as an automobile wrecking establishment after expiration of prescribed amortization period. Defendants resisted contending the ordinance, as applied to them, constituted deprivation of property without due process of law.

Trial court found for plaintiff and defendants appeal. We affirm.

To the extent here relevant the case was submitted to trial court on these stipulated facts:

Exhibit A is the Cerro Gordo County Zoning Ordinance which became effective June 4, 1962.

Defendants own and operate a business known as Chazen's Auto Parts on that real estate described as: "Beginning at the center of Section 12 in Township 96 North, Range 21 West of the 5th P.M., thence north along the west line of the Northeast Quarter (NE ¼) of said Section, 70 rods, thence East at right angles a distance of 22.87 rods, thence South at right angles to the South line of said Northeast Quarter (NE ¼), thence West along the South line of said Northeast Quarter (NE ¼) to the place of beginning, except that part which has been deeded to the State of Iowa for highway use."

Prior to adoption of the challenged ordinance defendants were engaged in the operation of said enterprise, and intentionally continued operations more than five years after enactment of the ordinance.

Under the terms thereof defendants' property is located in what is described as Zone A-Agricultural District. In material part the ordinance, Section XVI, provides:

"The lawful use of any building or land existing at the time of the enactment of this Ordinance may be continued although such use does not conform with the provisions of this Ordinance, except in the case of trailers used for dwelling or sleeping quarters.

"*    *    *

"E.    Cessation

"Notwithstanding any other provisions of this Ordinance:

"a. Any automobile wrecking or junk yard in existence in a district in which it is a non-conforming use, prior to the effective date of this Ordinance, shall within five (5) years from such date become a prohibited and unlawful use and shall be discontinued; *   *   *."

If an injunction is granted as plaintiff requests, defendants' automobile wrecking operations on the above described property must be accordingly terminated without payment of compensation.

Additionally trial court found defendants' business activities were substantial, but on the other hand no evidence was presented disclosing their use of the land involved any sizable investment in buildings or other improvements.

Despite the fact defendants assert 17 propositions relied upon for reversal, their argument is confined to claimed deprivation of property without due process of law. Section 1, Amendment 14, United States Constitution, and Article I, section 9, of the Iowa Constitution.

I. This case stands in equity and is accordingly reviewable de novo. Rule 334, Rules of Civil Procedure.

Although the scope of our review is the entire case, it will be confined to those propositions properly relied on *and* argued. Rule 344(a) (4) Third, R.C.P.; Braden v. Board of Supervisors of Pottawattamie Co., Iowa, 157 N.W.2d 123, 124; Quint-Cities Petroleum Co. v. Maas, 259 Iowa 122, 126, 143 N.W.2d 345; and B-W Acceptance Corporation v. Saluri, 258 Iowa 489, 499, 139 N.W.2d 399.

■    II. Enactment of zoning ordinances by the various counties is authorized by Code chapter 358A. And for present purposes the counties of this state qualify as municipal corporations. See Wapello County v. Ward, 257 Iowa 1231, 1234–1236, 136 N.W.2d 249.

Generally, reasonable zoning ordinances are within and constitute a lawful exercise of police power.

This court had occasion to deal with that subject in Anderson v. Cedar Rapids, Iowa, 168 N.W.2d 739, opinion issued June 10,

1969, and there said: "We have repeatedly held zoning is an exercise of police powers delegated by the state to municipalities, and to be strictly construed. (Authorities cited).

"However, *in the enactment of such ordinances, including amendments thereto, a city or town [county] exercises vested legislative powers attended by a strong presumption of validity, which means if facially valid, and reasonableness of the enactment is fairly debatable, it must be allowed to stand.* (Authorities cited).

"Stated otherwise, courts will not substitute their judgment as to wisdom or propriety of action by a city or town council, [county board of supervisors] acting reasonably within the scope of its authorized police power, in the enactment of ordinances establishing or revising municipal zones. (Authorities cited).

"Furthermore, we said in Plaza Recreational Center v. City of Sioux City, supra, loc. cit., 253 Iowa 253, 111 N.W.2d [758] 763: 'The test of whether a zoning ordinance is arbitrary and unreasonable is whether the means employed in the attempted exercise of the police power have any real, substantial relation to the public health, comfort, safety, and welfare, including the maintenance of property values. (Authorities cited).

"More recently this court held, a zoning ordinance is generally sustained as a valid exercise of police power in the interest of public peace, order, morals, health, safety, convenience, and the general welfare of a community, the prime consideration being its general purpose, not the hardship of individual cases. Jersild v. Sarcone, 260 Iowa 288, 149 N.W.2d 179, 183.

"Also, in the Plaza Recreational Center case, supra, 253 Iowa at 252, 111 N.W.2d at 762, is this pertinent statement: 'Generally speaking, whether the ordinance involved exceeded the council's authority, or whether is was unconstitutional as being in conflict with the due process or equal protection clauses of the state or federal constitution, *the burden to prove the proviso unreasonable, arbitrary, capricious or discriminatory is upon the one asserting the invalidity.* Hermann v. City of Des Moines, 250 Iowa 1281, 97 N.W.2d 893, and citations. The rule is well settled that when constitutional questions are raised all reasonable intendments must be indulged in favor of the validity of the enactment. We have also constantly held a classification or regulation of the use of property within the municipality will not be held arbitrary unless clearly so, and that when the issue as to whether it was an unreasonable or unequal exercise of power is fairly debatable, courts will not substitute their judgment for that of the legislative body charged with the primary duty and responsibility of determining the question. (Authorities cited.)' (Emphasis supplied.)"

As we said in Zilm v. Zoning Board of Adjustment, 260 Iowa 787, 150 N.W.2d 606, 610: "It is also well settled that when the constitutionality of an ordinance is challenged all reasonable intendments must be indulged in favor of its validity. Plaza Recreational Center v. City of Sioux City, 253 Iowa 246, 252–253, 111 N.W.2d 758, 762–763 and citations; Wilkins v. City of San Bernardino, 29 Cal.2d 332, 175 P.2d 542, 547.

" 'The strong presumption in favor of a legislative act applies, as well, to zoning ordinances, * * *.' Brackett v. City of Des Moines, 246 Iowa 249, 260, 67 N.W.2d 542, 547."

Furthermore, in the early case of Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, the court resolved all doubts as to whether a zoning ordinance measures up to the due process test when it held such an enactment, as with the exercise of any other police power, is constitutionally sound if reasonably applied.

See also Graham v. Worthington, 259 Iowa 845, 850–851, 146 N.W.2d 626; Benschoter v. Hakes, 232 Iowa 1354, 1361–1364,

8 N.W.2d 481; City of Los Angeles v. Gage, 127 Cal.App.2d 442, 274 P.2d 34, 38–39; Wolf v. City of Omaha, 177 Neb. 545, 129 N.W.2d 501, 507–509; McQuillin, Municipal Corporations, 1965 Rev.Vol. 8A, section 25.296, page 353; 101 C.J.S. Zoning § 16, page 704; 16 C.J.S. Constitutional Law §§ 174–198, pages 889–973; 58 Am.Jur., Zoning, sections 16–31, pages 949–960; and 16 Am.Jur.2d, Constitutional Law, sections 290–292, pages 563–572.

This means defendants, in their attack on the ordinance at hand assumed a heavy burden, and any doubts as to constitutionality of the enactment must be resolved in its favor.

III. Zoning has been generally referred to as the division of a municipal corporate area into separate zones or districts, and the prescribing of land type uses permitted in each such zone or district to subserve the health, safety, morals or welfare of the community. See Rhyne on Municipal Law, Section 32.1, page 811; McQuillin, Municipal Corporations, 1965 Rev.Vol. 8, section 25.01, page 12; 101 C.J.S. Zoning § 1, page 660; 58 Am.Jur., Zoning, section 1, page 940; and 45 Words and Phrases, Perm.Ed., "Zoning".

Also, as to purpose and recent trends this court stated in Plaza Recreational Center v. City of Sioux City, 253 Iowa 246, 254, 111 N.W.2d 758, 763: "Preservation of the character of the neighborhood is a valid reason for zoning regulations. It is said in McQuillin on Municipal Corporations, supra, at page 59 of Vol. 8, that 'zoning regulations promote the general welfare and are valid where they stabilize the value of property, promote the permanency of desirable home surroundings and add to the happiness and comfort of citizens.' We also said in Anderson v. Jester, supra, at page 457 of 206 Iowa, at page 357 of 221 N.W. [221 N.W. 354]: 'Reasonableness of a law or regulation depends on conditions existing when it is put into effect, * * *.' The police power under which zoning exists has been extended through-out the country for the protection of the values established and contemplated. In 58 Am.Jur., Zoning, section 21, page 953, it is stated: 'The modern tendency * * * is to uphold zoning regulations which formerly would have been rejected as arbitrary or oppressive, and in many cases objections to the validity of zoning restrictions on the ground that they are unreasonable, arbitrary, or oppressive, have been overruled.' Our view here perhaps falls within one of those trends for the protection of persons and established property values. In the case of Steinberg-Baum & Co. v. Countryman, supra, 247 Iowa 923, 930, 77 N.W.2d 15, 19, we recently recognized and approved the trend and upheld the purpose of 'promotion of prosperity and the general welfare' by the application of police power."

See also Code sections 358A.3–358A.5, and 101 C.J.S. Zoning § 2, page 665.

IV. "The term 'nonconforming use' is employed in the law of zoning, for the most part, to refer to a use which not only does not conform to the general regulation or restriction governing a zoned area but which lawfully existed at the time that the regulation or restriction went into effect and has continued to exist without legal abandonment since that time. In other words, it is a use that existed and was lawful when the restriction became effective and which has continued to exist since that time." McQuillin, Municipal Corporations, 1965 Rev.Vol. 8A, section 25.185, page 21. Also see Rhyne on Municipal Law, section 32.26, page 903, and 101 C.J.S. Zoning § 180, page 936.

So it is apparent we are here confronted with a nonconformity under the controverted county plan, and the constitutional right of a municipality to amortize or phase it out of existence within a fixed period of time.

V. A brief survey of the cases and authorities in this area disclose nonconforming uses have been a problem since the inception of zoning. It was originally thought such uses would be few, and

would naturally eliminate themselves through the passage of time, with restrictions on their expansion. But during the past two decades it has become increasingly evident pre-existing nonconformities have no natural tendency to fade away. On the contrary it appears they tend to continue and prosper because of the artificial monopoly accorded them by the law. However, it still remains, the basic aim and ultimate purpose of zoning is to confine certain classes of buildings and uses to specified localities. Nonconforming uses are inconsistent with that objective. In an effort to change nonconformance to conformance as speedily as possible, with due regard for the legitimate interests of the private property owner and the general public, legislative bodies have attempted different means to eradicate undesired uses.

The methods so employed include, (1) condemnation by use of eminent domain; (2) invoking the law of nuisance; (3) forbidding resumption of nonconforming uses after a period of nonuse or abandonment; (4) prohibiting or limiting extensions or repairs; and (5) amortizing the nonconformity over a reasonable period of time.

But the power of eminent domain would be inadequate in this state in that it is restricted to taking only for public use. See R & R Welding Supply Co. v. City of Des Moines, 256 Iowa 973, 977, 129 N.W.2d 666, and 13 Drake L.Rev. 95. Also, the law of nuisance falls short of the desired objective because a troublesome nonconforming use does not always create a traditional common law nuisance, though nonetheless violative of zoning purposes.

Pursuing the subject at hand one more step it is evident a court ordered immediate cessation on the nuisance theory, if applicable under any concept, would in most instances be more harsh and substantial than a reasonable amortization plan.

Finally, as disclosed in City of Los Angeles v. Gage, 127 Cal.App.2d 442, 274 P.2d 34, 41, it has been reasonably determined the only effective method of eliminating nonconforming uses yet devised is to amortize the offending building, structure or business operation, and prohibit the owner or operator from maintaining it after expiration of a designated period or date.

In support of the foregoing, see City of Seattle v. Martin, 54 Wash.2d 541, 342 P.2d 602, 603; Grant v. Mayor and City Council of Baltimore, 212 Md. 301, 129 A.2d 363; City of Los Angeles v. Gage, supra; Rhyne on Municipal Law, sections 32.26 through 32.33, pages 903–922; McQuillin, Municipal Corporations, 1965 Rev.Vol. 8A, sections 25.189–25.195, pages 36–46; 19 Case W. Res.L.Rev. 1042; 24 Md.L.Rev. 323; 31 Mo.L.Rev. 280; 57 Nw.U.L.Rev. 323; 10 Syracuse L.Rev. 214; and Annos. 22 A.L.R.3d 1134.

VI. We are satisfied plaintiff board of supervisors had statutory and constitutional authority to classify defendants' operations as a nonconforming usage.

■ However, there has been a conflict in the views adopted by various courts on the power of a municipality, in the adoption of zoning ordinances, to terminate nonconforming uses upon expiration of a prescribed period.

But as heretofore disclosed, recent judicial decisions reveal the pronounced trend is toward elimination of nonconformities by the amortization process. And the test most commonly employed by courts in determining reasonableness of the liquidation period is based upon a balancing of public good against private loss. This unavoidably necessitates an examination of the factual situation presented in each case. Keller v. City of Council Bluffs, 246 Iowa 202, 208, 66 N.W.2d 113, 51 A.L.R.2d 251.

Here again we refer to City of Los Angeles v. Gage, supra. There, as in the case at bar, certain nonconforming uses were to be discontinued within five years after adoption of the zoning ordinance. Upholding the validity of this legislative proviso the court said, loc. cit., 274 P.2d 44: "The distinction between an ordinance re-

stricting future uses and one requiring the termination of present uses within a reasonable period of time is merely one of degree, and constitutionality depends on the relative importance to be given to the public gain and to the private loss. Zoning as it affects every piece of property is to some extent retroactive in that it applies to property already owned at the time of the effective date of the ordinance. The elimination of existing uses within a reasonable time does not amount to a taking of property nor does it necessarily restrict the use of property so that it cannot be used for any reasonable purpose. Use of a reasonable amortization scheme provides an equitable means of reconciliation of the conflicting interests in satisfaction of due process requirements. As a method of eliminating existing nonconforming uses it allows the owner of the nonconforming use, by affording an opportunity to make new plans, at least partially to offset any loss he might suffer. The loss he suffers, if any is spread out over a period of years, and he enjoys a monopolistic position by virtue of the zoning ordinance as long as he remains. If the amortization period is reasonable the loss to the owner may be small when compared with the benefit to the public. Nonconforming uses will eventually be eliminated. A legislative body may well conclude that the beneficial effect on the community of the eventual elimination of all nonconforming uses by a reasonable amortization plan more than offsets individual losses."

In Lachapelle v. Town of Goffstown, 107 N.H. 485, 225 A.2d 624, 22 A.L.R.3d 1128, an ordinance permitting the nonconforming use of land as a motor vehicle junk yard for only one year after its enactment was upheld. There, after an exhaustive review of zoning and the elimination of nonconformities, the court said at 225 A.2d 627: " 'Junked automobiles are considered a health and safety hazard for numerous reasons. They tend to become homes for rats and vermin, children are attracted to them and most junked cars still have gas tanks with gasoline in them. They have trunk lids which may fall shut, or the car may be ready to fall if disturbed. However, another and more subtle criticism of junked autos is that they tend to create neighborhood blight. The presence of old cars on the streets [highways] gives the neighborhood a shabby and rundown appearance. This, in turn, creates secondary reactions regarding the cleanliness and care given the neighborhood by its residents.' Report of the Advisory Committee, Junk Auto Disposal Project, sponsored by New Hampshire Municipal Association and New Hampshire Charitable Fund, p. 2 (October 1966)."

And in Spurgeon v. Board of Commissioners, 181 Kan. 1008, 317 P.2d 798, the court upheld validity of a two year period for removal of a car wrecking establishment and junk yard as a nonconforming use under a zoning ordinance.

With regard to the foregoing see also Annos. 22 A.L.R.3d 1137, 1148.

VII. For reasons heretofore stated, determination as to reasonableness of the questioned five year amortization provision dictates a consideration of the factual situation here presented.

As aforesaid, the record discloses defendants owned and operated their auto salvage business prior to passage of the contested ordinance which, inter alia, prohibited operation of any auto salvage yard in the area occupied by defendants, Zone A-Agricultural. It also accorded existing junk yards in that area five years to discontinue operations. At the same time conduct of such a business was permitted in heavy industrial districts, created under section 14 of the enactment. Defendants have intentionally continued their wrecking operations beyond the fixed limitation period. The only evidence regarding their enterprise is that it is a substantial business operation. No showing is made relative to defendants' business investment, value of any improvements on their land, or extent of hardship,

if any, in complying with the disputed ordinance.

Upon the basis of this record we are called upon to determine whether defendants adequately met and sustained the burden they assumed in challenging reasonableness of the ordinance as it applies to them. It is argued by defendants they did so.

In support of that position they cite and lean rather heavily on Stoner McCray System v. City of Des Moines, 247 Iowa 1313, 78 N.W.2d 843, 58 A.L.R.2d 1304. But we find that case neither factually comparable nor here controlling. In Stoner McCray this court held unreasonable, a zoning ordinance which, in effect, provided for elimination of certain billboards within two years after the enactment. However, the record there disclosed the sign company, relying on permits issued by the municipality, had promptly made substantial investments in the construction of new and costly advertising boards.

■ The matter of monetary expenditures, though not alone necessarily determinative, is one element to be considered whenever relevant or possible, with regard to any zoning amortization program, in the weighing of private hardship against public health, safety, morals and welfare. See 57 N.W. U.L.Rev. 323, 328, and Annos. 22 A.L.R.3d 1134, 1139–1159.

On the other hand, as previously revealed no facts are before us by which we may, in the balancing process, either apply or effectively evaluate the matter of investment, value or other monetary detriment to defendants by application of the prescribed amortization plan. Furthermore, the record is devoid of any informative showing as to other possible material elements or factors manifesting unreasonableness of the subject ordinance as applied to these defendants. See in that regard 24 Md.L.Rev. 323, 329.

Moreover, this court said in the Stoner McCray case, supra, loc. cit., 247 Iowa 1320, loc. cit., 78 N.W.2d 843: "We do not wish to infer herein that under certain circumstances a municipality could not provide for the termination of nonconforming uses, especially if the period of amortization of the investment was just and reasonable, * * *."

VIII. It is to us evident defendants have failed to show, with sufficient certainty, the amortization provision of the contested ordinance, as applied to them, is unconstitutional. Also, the ordinance being facially valid and its reasonableness fairly debatable, it must accordingly be upheld.

Resultantly we now hold the challenged amortization provision of the Cerro Gordo County Zoning Ordinance, as it applies to defendants in this case, is not unreasonable and does not constitute an unconstitutional exercise of the police power delegated by our state legislature.

IX. Any stay order heretofore issued by this court in the case at bar is hereby annulled.

However, it is to us apparent defendants should be and are allowed 120 days from and after date of filing of this opinion to comply with the terms of the ordinance here involved, and no writ of injunction shall issue by trial court until expiration of that period of time.

Affirmed.

GARFIELD, C. J., and SNELL and Le-GRAND, JJ., concur.

STUART, LARSON, MOORE and BECKER, JJ., dissent.

MASON, J., takes no part.

The members of this court being equally divided, the judgment of the trial court stands affirmed by operation of law. (Section 684.10, Code, 1966).

STUART, Justice (dissenting).

Zoning is in the public interest. It is essential to the orderly growth of our bur-

geoning communities and contributes to the public health, morals, safety and general welfare. However, we are now confronted for the first time with a zoning law which eliminates a lawful nonconforming use after a fixed period of time under the police power. In my opinion such legislation takes property without due process of law and just compensation in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States and sections 9 and 18, Article I, Constitution of the State of Iowa.

"We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." Mr. Justice Holmes in Pennsylvania Coal Co. v. Mahon (1922), 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322, 28 A.L.R. 1321, 1326.

I agree with Judge Hutcheson's statement in his dissent to the opinion in Standard Oil Co. v. City of Tallahassee (1950), 5 Cir., 183 F.2d 410, 414: "I am in no doubt that in sustaining this admittedly confiscatory ordinance, a good general principle, the public interest in zoning, has been run into the ground, the tail of legislative confiscation by caprice has been permitted to wag the dog of judicial constitutional protection."

I. "Stated in its simplest terms, amortization contemplates the compulsory termination of a non-conformity at the expiration of a specified period of time, which period is equal to the useful economic life of the non-conformity." Katarincic, Elimination of Nonconforming Uses, Buildings and Structures by Amortization—Concept v. Law; 2 Duquesne Univ.L.Rev. 1.

"The basic idea is to determine the remaining normal useful life of a pre-existing nonconforming use. The owner is then allowed to continue his use for this period and at the end must either conform or eliminate it." Note, 44 Cornell L.Q. 450, 453.

Supporters of amortization contend it is fair. "The useful life of the building or use to which the premises are devoted is determined and the owner has that length of time to conform. The loss he suffers if any is spread over a period of years, and he further enjoys a monopolistic position by virtue of the zoning ordinance as long as he remains. Amortization will eventually eliminate nonconforming uses." Note, 35 Va.L.Rev. 348, 357.

As my quarrel is with more basic issues, I will do no more than point out in passing that almost all of the legislation which has come before the courts has not been within the definition of amortization. No effort has been made to provide a method by which the amortization period could be correlated to the actual remaining life of a particular type of structure or the particular use being eliminated. Fixed periods have been provided which have varied from one to thirty or more years. Note, 35 Va.L.Rev. 348, 356. Courts, without tests or guidelines, have held these periods reasonable or unreasonable on an ad hoc basis. It would be difficult, if not impossible, to explain why the useful economic life of an operating automobile salvage yard is limited to five years.

"In practice this spells confusion, instability, inability to diagnose what are legal rights, inconsistency, arbitrariness and discrimination in administrative and court decisions, and an avalanche of litigation. That Pandora's box is opened, regardless of the best possible intentions on the part of all concerned. Nor is the judgment appealed from an unwarranted interference by the courts in the province of the municipal legislature. It simply follows precedent from the beginning of zoning practice. The new rule has the additional infirmity that it opens wide new fields of discretion in administrative law without any workable standards by which it is to be guided.

"The lack of any principle in applying the novel theory of 'amortization' betrays a fundamental weakness in the theory. Zoning,

like other public programs, is not always best administered at the hands of its enthusiasts. The existence of nonconforming uses has spoiled the symmetry in the minds of zoning experts. It has bulked so large in this context that, desirable as the elimination of nonconforming uses may be, it has sometimes been presented as though it were more important than ordinary property rights." Van Voorhis, J., dissent in Harbison v. City of Buffalo (1958), 4 N.Y.2d 553, 573, 176 N.Y.S.2d 598, 614, 152 N.E.2d 42, 53.

II. The right to own and possess property carries with it the right to use and enjoy such property for lawful purposes and arbitrary governmental interference with its reasonable use and enjoyment is a taking of private property without due process of law and without just compensation contrary to the provisions of the federal and state constitutions cited above.

In Central States Theatre Corp v. Sar (1954), 245 Iowa 1254, 1258–1259, 66 N.W. 2d 450, 453, we reviewed our authorities relating to the aspects of due process of law pertinent here which hold the state may, under its police power, regulate but *not prohibit or unreasonably restrict* an individual's right to operate a legitimate business. Its real purpose must be to protect the public health, morals or general welfare, and it must be reasonably required and suited to attain that purpose. It cannot masquerade as an exercise of the police power and arbitrarily invade personal rights and private property. It cannot disregard the constitutional guarantees.

This dissent will proceed on the premise that vested rights in property are being taken from the owner without compensation. The majority does not claim otherwise, but follows the cases which hold and the legal writers who maintain amortization is a reasonable method of regulating the use of property under the police power and, theoretically at least, examine the facts in each case to determine if the amortization period is a reasonable application under the particular circumstances. These authorities

are cited in the majority opinion and it would serve no useful purpose to repeat them here. However, I will examine some of the leading authorities.

In 1929 two Louisiana cases gave early approval to the amortization principle. State ex rel. Dema Realty Co. v. Jacoby, 168 La. 752, 123 So. 314; State ex rel. Dema Realty Co. v. McDonald, 168 La. 172, 121 So. 613, 614–615. In the latter case, the court said: " * * * we take it to be well settled that any business operated or maintained in violation or in defiance of a zoning ordinance is to be regarded as a public or common nuisance." This holding has been described as "More like Cossack interpretations of Muscovite ukases than utterances of a court operating under the benign provisions of the Magna Carta." Fratcher, Constitutional Law-Zoning Ordinances Prohibiting Repair of Existing Structures, 25 Mich.L.Rev. 642, 644.

It is not uncommon to find language in the opinions pointing to elements in the eliminated use tending to make it a nuisance. The majority does so here, although there is no effort to enjoin this business was a nuisance. See Town of Grundy Center v. Marion, 231 Iowa 425, 1 N.W.2d 677. It must be remembered, however, that the cases do not base the constitutionality of the zoning law on the requirement that the business be an objectionable one. The Louisiana cases involved a drug store and a grocery store. Amortization periods have been constitutionally approved for a gasoline station, Standard Oil Co. v. City of Tallahassee, 183 F.2d 410 and a wholesale plumbing business, City of Los Angeles v. Gage (1954), 127 Cal.App.2d 442, 274 P.2d 34.

Most of the courts approving the amortization technique have adopted the reasoning expressed in City of Los Angeles v. Gage, supra, and Livingston Rock and Gravel Co. v. County of Los Angeles, (1953), 43 Cal.2d 121, 272 P.2d 4. The majority quotes from Gage in Division VI. The very heart of this approach to retroactive zoning is expressed in the fol-

lowing sentence: "The distinction between an ordinance restricting future uses and one requiring the termination of present uses within a reasonable period of time is merely one of degree, and constitutionality depends upon the relative importance to be given to the public gain and to the private loss."

This analogy is of utmost importance to this line of reasoning as it enables the court to cite cases approving of the restriction of the future uses of real estate and limiting the right to make additions to and repairs of existing uses and structures as authority for the constitutionality of zoning ordinances terminating existing uses. In my opinion it will not bear scrutiny.

There is a vast difference in kind between the unexercised right to use real estate for some purpose in the future, which right may or may not ever be invoked and the exercised right to devote real estate to a lawful purpose, which right has been invoked at the expenditure of time and money by the owner. The implications and effects are not similar and the losses sustained by the respective owners are far different. Limitations on future uses deprives the owner of some prospective advantage only. The termination of an existing use necessarily results in an out-of-pocket loss to the owner.

The difference in degree is not between the restriction of present uses and future uses, but between the immediate termination of a lawful use and its termination at a fixed time in the future. "To our knowledge, no one has, as yet, been so brash as to contend that such a pre-existing lawful nonconforming use properly might be terminated *immediately*. In fact, the contrary is implicit in the amortization technique itself which would validate a taking *presently* unconstitutional by the simple expedient of *postponing* such taking for a 'reasonable' time." Hoffmann v. Kinealy (1965), Mo., 389 S.W.2d 745, 753.

Law review writers have acknowledged that questionable constitutionality of im-

mediate retroactive zoning was one of the reasons for permitting nonconforming uses to continue under early zoning efforts. 35 Va.L.Rev. 348, 353; Villanova L.Rev. 1965–1966, 189, 190; Wisconsin L.Rev.1951, 685, 688.

Delaying the effective date of an unconstitutional act does not make it constitutional.

The latter part of the quote from Gage states that constitutionality "depends on the relative importance given to the public gain and to the private loss." An individual's right to due process cannot rest upon such a nebulous balancing of the scales by courts of various convictions and inclinations. If this test were all that is needed to satisfy due process, we could avoid the use of eminent domain in many situations. With proper planning property owners could be told that in five years their property will be taken for a public purpose without compensation. Why should the public pay to use property for water systems or reservoirs, sewage lines or disposal plants, highways or utility right of ways? Certainly these services are much more basic to public health, morals, safety and general welfare than zoning, but no one has yet suggested the amortization technique could be employed to take the back corner of an unimproved 40 acres for a pumping station or to run a utility line six feet underground across farm ground without compensation because the public need is so much greater than the individual loss.

"It would be a novel proposition that a municipality can take private property for a public use without compensation provided that it does not take too much." Dissent by Van Voorhis, J., in Harbison v. City of Buffalo, 4 N.Y.2d 553, 176 N.Y.S.2d 598, 609, 152 N.E.2d 42, 49.

This brings us to an obvious contradiction in the reasoning supporting the amortization theory. The elimination of a business after a fixed period of time is said to be reasonable because the public need

outweighs the private loss. If this were actually the case, the public should be willing to accept the bargain of a slight burden for a great gain. On the other hand zoning advocates say eminent domain has not worked because the cost to the public is so great. If this is true, why should the individual property owner be forced to stand a substantial loss when the public is unwilling to pay for the gain it achieves at his loss?

The balance of public gain against private loss is weighed monetarily. No consideration is given to the ability of the owner to shoulder the losses. The cost of moving a junk yard would be a much greater burden to a small businessman struggling to get along than the loss of a large building to a multi-million dollar corporation. Monetary loss should go to the amount of compensation to be paid, not the determination of the right to compensation. The fact that damages may be difficult to determine has never been held to bar the right to damages.

Most of what has been said is not original. Many of the thoughts expressed as my own were previously stated in Hoffmann v. Kinealy, Mo., 389 S.W.2d 745. This well written opinion examined the authorities closely before arriving at the result I believe proper here.

Additional thoughts with which I am in accord are expressed in the dissent in Harbison v. City of Buffalo, supra. As I cannot improve the language, I quote. The page citations are from 152 N.E.2d.

"Zoning relates to the *future* development of municipalities. Areas in cities that have already been developed cannot be zoned retroactively. That is the function of municipal redevelopment, which is constitutionally authorized by statutes directing payment of just *compensation* for property that is appropriated. * * * Retroactive zoning, as this clearly is, resembles slum clearance more than zoning, which is for the future. (176 N.Y.S.2d p. 608, 152 N.E.2d p. 49).

"The circumstance that this is a cooperage establishment or junk yard ought not to obscure that the principle of the decision applies to any kind of business which, due to lapse of time, has been overtaken by changes in the neighborhood. The principle of the decision applies equally to stores, shops or service organizations which are retroactively legislated out of existence by the abolition of prior nonconforming uses. If petitioners' establishment is not secure against this kind of invasion, no one else's business is better protected. The neighbors or the officials of a municipality in one year may look askance at a junk or cooperage yard, and in another year may frown upon the conduct of any other type of commerce or industry. The people who moved into petitioners' vicinity and now find their business offensive may not be aware that the principle of the decision unsettles their own property rights, and that it may suddenly be used against them in unexpected ways if agitation arises to legislate them out of business by a similar procedure. It makes little difference what the nature of their businesses may be. The smaller they are the more vulnerable they become to this kind of attack, which is based on misfortune of unpopularity. Democracy depends upon respect for the individual as well as upon majority rule. The relaxation of constitutional safeguards protecting commonly accepted personal and property rights, goes hand in hand with the multiplication of pressure groups. People should not be obliged to organize to preserve rights the safeguarding of which is the proper function of the law. The small manufacturer or merchant feels this acutely, since he ordinarily finds it more difficult to succeed in wielding organized power for his own protection when property rights depend upon the discretion of legislative bodies. No question is raised here concerning the good faith of the enactment or administration of this ordinance. Nevertheless petitioners find themselves confronted by the organized civil power of the municipality, * * *. If this part of the city is to be redeveloped,

it should be done through the enactment of a statute similar in principle to slum clearance acts, whereby just compensation can be paid for private property that is confiscated for a public use. Petitioners have well-recognized legal property rights which ought to be protected in court. (176 N.Y. S.2d p. 611, 152 N.E.2d p. 51).

"This theory to justify extinguishing nonconforming uses means less the more one thinks about it. It offers little more promise of ultimate success than the other theories which have been tried and abandoned. In the first place, the periods of time vary so widely in the cases which have been cited from different States where it has been tried, and have so little relation to the useful lives of the structures, that this theory cannot be used to reconcile these discordant decisions. Moreover the term 'amortization', as thus employed, has not the same meaning which it carries in law or accounting. It is not even used by analogy. It is just a catch phrase, and the reasoning is reduced to argument by metaphor. Not only has no effort been made in the reported cases where this theory has been applied to determine what is the useful life of the structure, but almost all were decided under ordinances of statutes which prescribe the same time limit for many different kinds of improvements. This demonstrates that it is not attempted to measure the life of the particular building or type of building, and that the word 'amortization' is used as an empty shibboleth." (176 N.Y.S.2d p. 615, 152 N.E.2d p. 54).

The Ohio Supreme Court rejected the approach adopted by the majority in City of Akron v. Chapman, 160 Ohio St. 382, 116 N.E.2d 697, 700, 42 A.L.R.2d 1140, 1144–45. They said:

"We are asked by the plaintiff herein to uphold the provision of a municipal ordinance which in effect denies the owner of property the right to continue to conduct a lawful business thereon, which use was in existence at the time of the passage of the ordinance and has continued without expansion or interruption ever since. If we do this on the ground that the provision is a proper exercise of the police power, then the right to continue to conduct other lawful businesses, similarly established and conducted on zoned property, may likewise be denied by legislative fiat under the guise of a proper exercise of the police power. * * *

"The right to continue to use one's property in a lawful business and in a manner which does not constitute a nuisance and which was lawful at the time it was acquired is within the protection of Section 1, Article XIV, Amendments, Constitution of the United States * * *."

III. The majority states eminent domain could not be used in Iowa as it is required that property be taken for a public purpose. Zoning depends upon public purpose for its constitutionality. I have no doubt that it the legislature provided for the buying of nonconforming uses by eminent domain, it would be constitutional. The fact that eminent domain has not at this time been authorized for this purpose does not make retroactive zoning of this nature constitutionally permissible.

IV. No question was raised as to the power of the county to provide for retroactive zoning under the general enabling act chapter 358A, Code, 1966, and the majority properly makes no reference to this proposition. However, I do not feel it is improper to point out that there is no specific authorization for the elimination of nonconforming uses in the statutes. Although the absence of such provision has given the legal writers no difficulty, I question whether the Iowa legislature intended to authorize the counties to confiscate property rights. It seems to me that such an invasion of private property should be specifically authorized rather than implied from the general enabling act.

I am puzzled by the eagerness with which some courts and legal writers are willing to take an individual's property for the

benefit of the general public without compensation when there is no suggestion that existing use constitutes a nuisance. It seems to me to run counter to other recognizable trends in the law. An individual's personal constitutional rights are being protected with zeal and fervor, yet, "amortization" permits vested property rights to be confiscated. The trend in tort law is to remove the burden of the injury from the victim and spread the loss on a larger segment of society, but "amortization" saddles the loss on the innocent victim when society itself is the beneficiary. At a time when the rights of the poor and disadvantaged are being given recognition and potency "amortization" strikes at the small, unpopular and unorganized.

I would reverse.

LARSON, MOORE and BECKER, JJ., join in this dissent.